**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

ROBERT C. LAITY,                                )
                                                )
      Plaintiff,                            )
                                                )
                                                )  Case No. 20-cv-2511-EGS
      v.                                    )
                                                )
KAMALA DEVI HARRIS                              )
                                                )
      Defendant.                            )
_____)


**BRIEF _AMICUS CURIAE_ OF
U.S. ALLEGIANCE INSTITUTE
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

_____/s William J. Olson_____     Mario Apuzzo* (NJ Bar No. 030611982)
William J. Olson (D.C. Bar No. 233833)     185 Gatzmer Avenue
Jeremiah L. Morgan (D.C. Bar No. 1012943)     Jamesburg, New Jersey 08831
William J. Olson, P.C.     (732) 521-1900
370 Maple Avenue West, Suite 4     apuzzo@erols.com
Vienna, Virginia  22180-5615     *pro hac vice motion forthcoming
(703) 356-5070
wjo@mindspring.com

Dated:  November 9, 2020     Counsel for _Amicus Curiae_
     U.S. Allegiance Institute

### TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTEREST OF U.S. ALLEGIANCE INSTITUTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.       The Original Public Meaning of "Natural Born Citizen" . . . . . . . . . . . . . . . . . . . . . . . . . 2

         A.       Textual Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

         B.       Purpose for the Natural Born Citizen Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         C.       Historical Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                  1.       Natural Born Subjects in Great Britain . . . . . . . . . . . . . . . . . . . . . . . . . 6

                  2.       The Framers Looked To The Law Of Nations And Emer De Vattel
                           And Not The English Common Law For Their Definition Of A
                           "Natural Born Citizen" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                  3.       David Ramsay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                  4.       St. George Tucker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                  5.       James Wilson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                  6.       Nathan Dane . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                  7.       The Naturalization Acts Of Congress . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.      Developments Surrounding the Fourteenth Amendment Did Not Change the
         Meaning of Natural Born Citizen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         A.       Civil Rights Act of 1866 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         B.       The Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.     Kamala Devi Harris Is Not a Natural Born Citizen . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ii

## <u>TABLE OF AUTHORITIES</u>

Page

<u>FEDERAL CASES</u>

<u>Benny v. O'Brien</u> (1895), 29 Vroom (58 N.J.Law). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Dred Scott v. Sandford</u>, 60 U.S. 393 (1857) (Daniel, J., concurring). . . . . . . . . . . . . . . . . 8, 9, 16

<u>Ex parte Reynolds</u>, 1879, 5 Dill., 394. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Inglis v. Trustees of Sailors' Snug Harbor</u>, 28 U.S. 99 (1830). . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>INS v. Rios-Pineda</u>, 471 U.S. 444 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Lynch v. Clark,</u> 1 Sandf. Ch. 656  (N.Y. 1844) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>Marbury v. Madison,</u> 5 U.S. 137 (1802). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

<u>Minor v. Happersett</u>, 88 U.S. 162 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, *passim*

<u>Plyler v. Doe</u>, 457 U.S. 202 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Robinson v. Bowen</u>, 567 F. Supp. 2d 1144 (N.D.Cal.2008)  . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Rutgers v. Waddington</u> (1784) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Shanks v. Dupont</u>, 28 U.S. 242 (1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Sugarman v. Dougall</u>, 413 U.S. 634 (1973) (Rehnquist, J., dissenting). . . . . . . . . . . . . . . . . . 19

<u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44 (1966) (J. Souter, dissenting) . . . . . . . . . . . 10

<u>Slaughter-House Cases</u>, 83 U.S. 36 (1873). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21, 22

<u>Smith v. Alabama</u>, 124 U.S. 465 (1888). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>The Venus</u>, 12 U.S. (8 Cranch) 253 (1814) (Marshall, C.J., concurring). . . . . . . . . . . . . . . . . 9

<u>Tisdale v. Obama</u>, 2012 WL 7856823 (E.D.Va.Jan.23, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>United States v. Ward</u>, 42 F.320 (C.C.S.D.Cal. 1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

iii

United States v. Wong Kim Ark, 169 U.S. 649 (1898) . . . . . . . . . . . . . . . . . . . . . . . . . 8, *passim*

FOREIGN CASES

Calvin's Case, 7 Coke, 1 (1608) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14

FEDERAL CONSTITUTION

U.S. Const. art. II, sec. 5, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *passim*

Twelfth Amendment, U.S. Const. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Fourteenth Amendment, U.S. Const. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *passim*

CONSTITUTIONAL CONVENTIONS

Elliott's Debates:  Volume 5 Appendix to the Debates of the Federal
Convention, Note 5, Article IX Sec. 1 in Appendix F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

James Madison, Notes of Debates in the Federal Convention of 1878
Reported by James Madison (1966), p. 364 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

2 Documentary History of the Constitution, IV, 334-336. 3 Records of the
Federal Convention of 1787, p. 129 (M. Farrand ed. 1911) . . . . . . . . . . . . . . . . . . . . . . . . . 7

THE FEDERALIST PAPERS

James Madison, The Federalist No. 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Alexander Hamilton, The Federalist No. 68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FEDERAL STATUTES

The Naturalization Acts of 1790 (1 Stat. 103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17

The Naturalization Acts of 1795 (1 Stat. 414) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17

The Naturalization Acts of 1802 (2 Stat. 153) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

The Naturalization Acts of 1855 (10 Stat. 604) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Civil Rights Act of 1866 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

iv

Cable Act of 1922 (ch. 411, 42 Stat. 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

8 U.S.C. § 1401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

STATE CASES

Ankeny v. Governor of State of Ind., 916 N.E.2d 678 (Ind.Ct.App.2009). . . . . . . . . . . . . . . . . . 24

STATE STATUTES

Political Code of the State of New York (1860). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

OTHER AUTHORITIES

John A. Bingham, (R-Ohio) US Congressman, March 9, 1866 Cong. Globe,
39th, 1st Sess., 1291 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1 William Blackstone, Commentaries 442 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Black's Law Dictionary 776 (4th ed. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Jaques Burlamaqui (1747) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Patrick J. Charles, Decoding the Fourteenth Amendment's Citizenship
Clause:  Unlawful Immigration, Allegiance, Personal Subjection, and the
Law, 51 Washburn L.J., Issue 2 (forthcoming Spring 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S. House Speaker Langdon Cheves (1814). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1 Timothy Cunningham, A New and Complete Law-Dictionary, or,
General Abridgment of the Law (1783) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

4 Nathan Dane, A General Abridgment And Digest Of American Law,
Ch. 131, art. 2, § 2-8, 698 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Linda K. Kerber, No Constitutional Rights to be Ladies 15 (New York: Hill &
Wang, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Andrew C. Lenner, The Federal Principle in American Politics, 1790-1833 (2001) . . . . . . . . . 10

John Locke (1689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Pastor Alexander McLeod (1815). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

v

Samuel von Pufendorf (1691). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

David Ramsay, A Dissertation on the Manners of Acquiring the Character
and Privileges of a Citizen (1789) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

St. George Tucker, Blackstone's Commentaries: with Notes of Reference
to the Constitution and Laws of the Federal Government of the
United States and of The Commonwealth of Virginia (1803). . . . . . . . . . . . . . . . . . . . 12

E. de Vattel, The Law of Nations, bk. 1, c. 19, sec. 212 (London 1797)
(1st ed. Neuchatel 1758). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 21

E. de Vattel, The Law of Nations, bk. 1, c. 19, sec. 214 (London 1797)
(1st ed. Neuchatel 1758) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

James Wilson, 1st commentaries on the Constitution (1792). . . . . . . . . . . . . . . . . . . . . 13

1

## INTEREST OF U.S. ALLEGIANCE INSTITUTE[1]

The U.S. Allegiance Institute ("USAI") respectfully submits this *amicus* brief in support of Plaintiff Robert Laity's Opposition to Defendant's Motion to Dismiss the Complaint. The interest of the *amicus curiae* is set out in the accompanying motion for leave to file.

## SUMMARY OF ARGUMENT

This case is not about whether defendant Kamala Harris is a "citizen" of the United States under the Fourteenth Amendment, which is the essence of defendant's defense. Rather, it is about whether she is a "natural born Citizen" under Article II. The original Constitution speaks of "Citizen" and "natural born Citizen" of the United States. The Fourteenth Amendment addresses "citizens" of the United States. Under the Constitution, all natural born citizens are citizens, but not all citizens are natural born citizens. To be eligible for those offices, both presidents and vice-presidents must be natural born citizens and not just citizens. The two types of citizenships have their own historical development and different meanings. Defendant takes those who are citizens under the Fourteenth Amendment and declares them to be natural born citizens. Defendant misses the critical constitutional distinction between the two citizenships, conflates and confounds them, and therefore invites this Court to commit constitutional error.

Under the common law with which the Framers were familiar when they drafted and adopted the Constitution, a natural born citizen was a child born in a country to parents who were its citizens at the time of the child's birth. Being born under such circumstances, one was born

---

[1] Plaintiff *pro se* did not author any part of this brief nor did he make any monetary contribution intended to fund the preparation or submission of it. There are no persons or entities which made any monetary contribution to its preparation or submission. A motion for leave to file is filed herewith.

2

with unity of citizenship and sole natural allegiance to the U.S. which the Framers required of future presidents and commanders-in-chief of the military.  In contrast, a citizen of the U.S. under the Fourteenth Amendment is simply a person born in the U.S. while "subject to the jurisdiction thereof."  Birth in the U.S. is linked to merely being present in its territory and subject to its laws.  This type of citizenship can produce dual and triple allegiance at birth.  The Framers' need and requirement that the President and Commander-in-Chief have natural allegiance only to the U.S. could not be satisfied with such a loosened standard of U.S. citizenship.  Kamala Harris, born in the U.S., may be a Fourteenth Amendment "citizen" of the U.S., but because she was born to two non-U.S. citizen parents, she is not nor can she be an Article II natural born citizen.

## ARGUMENT

### I.      The Original Public Meaning of "Natural Born Citizen"

District of Columbia v. Heller, 554 U.S. 570 (2008) is instructive in providing a methodology and list of relevant sources that our U.S. Supreme Court uses for interpreting the Constitution.  There the Court looked for the meaning that the Constitution had as originally drafted and ratified.  In determining the meaning of a natural born citizen, we will follow that decision, seeking to present the original meaning of "natural born citizen" of the United States and "citizen" of the United States under the Fourteenth Amendment.

#### A.      Textual Analysis

Article II, Section 1, Clause 5 provides in relevant part: "No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President. . ."  The Twelfth Amendment provides in pertinent part:

3

"But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United State."  Hence, ineligibility to be President disqualifies one from being Vice-President.  Reading the plain text of Article II shows that for those born after the adoption of the Constitution, to be eligible to be president, a person must be a "natural born citizen" of the U.S. and not just a "citizen" of the U.S.  The text shows that the Framers employed the term "natural born citizen" and not "born citizen," "citizen at birth," or some other like description.

Chief Justice John Marshall explained in <u>Marbury v. Madison</u>, 5 U.S. 137, 174 (1802): "It cannot be presumed that any clause in the Constitution is intended to be without effect, and therefore such construction is inadmissible unless the words require it."  Hence, words written in the Constitution must have meaning. Article II includes both a "natural born citizen" and "Citizen" of the United States, with only the former being eligible to be President for those born after the adoption of the Constitution.  Hence, the text of Article II sets a "natural born citizen" apart from a "Citizen of the United States."  Given the distinct meaning that Article II gives to these separate clauses, we cannot conflate and confound them.  Given that an Article II "natural born citizen" stands on its own, we cannot simply substitute in its place an Article I "Citizen" of the United States as defined by the Fourteenth Amendment or Acts of Congress which have a different constitutional meaning.  Our analysis will show that the natural born citizen clause is a term of art, an idiom, a unitary clause.  Demonstrating that one is a "citizen" of the United States under the Fourteenth Amendment or some Act of Congress is not sufficient to show that one satisfies the "natural born citizen" clause.  The constitutional text does not provide a meaning of the "natural born citizen" clause.  We therefore must look outside the Constitution for its

4

meaning.

### B.    Purpose for the Natural Born Citizen Clause

One area we can look to is finding the purpose for which the Framers included the clause into Article II.  The framers' intent for inserting the natural born citizen clause in the Constitution was for the safety and preservation of the nation by excluding monarchical and foreign influence and attachment from the Office of President and Commander in Chief of the Military.  On July 25, 1787, John Jay wrote a letter to General Washington, stating: "Permit me to hint, whether it would not be wise & seasonable to provide a strong check to the admission of Foreigners into the administration of our national Government; and to declare expressly that the Command in chief of the american army shall not be given to, nor devolve on, any but a natural born Citizen" ("born" underlined in the original).[2]  On September 2, 1787, George Washington wrote a letter to John Jay the last line of which read: "I thank you for the hints contained in your letter."[3]  On September 4, 1787, the "natural born Citizen" requirement appeared in the draft of the Constitution. From the chronology of these events, we can conclude that it was probably Jay's letter to Washington and his wanting a "strong check" on foreign influence infecting the office of the Commander in Chief which motivated the Framers to insert the clause as part of the eligibility requirements to be President and Commander in Chief.  Jay, wanting a strong check on foreign influence, would not have allowed a person born to alien parents to be eligible for the office of Commander-in-Chief of the Military. Only a person born in the United States to U.S.

---

[2]   http://rs6.loc.gov/cgi-bin/query/r?ammem/hlaw:@field%28DOCID+@lit%28fr00379%29%29.

[3]   http://www.consource.org/index.asp?bid=582&fid=600&documentid=71483.

5

citizen parents, with birth under such circumstances giving to one from the moment of birth sole natural allegiance to the United States, would have satisfied his need to keep foreign and monarchical influence out of that office.

During the Constitutional Convention James Madison objected to the President being elected by the state Legislatures because it would introduce into the election foreign influence and interference from foreign powers who would want a person in that office who was attached to their politics and interests.  James Madison, Notes of Debates in the Federal Convention of 1878 Reported by James Madison (1966), p. 364 ("Madison").  Convention delegates Pierce Butler and Hugh Williamson expressed the same concern about foreign influence.  Id. 366 and 367-68.  There were various debates which revealed the delegates' concern with keeping foreign influence out of the national government.  Alexander Hamilton also had great concern for foreign influence.  He explained:

> Nothing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption. These most deadly adversaries of republican government might naturally have been expected to make their approaches from more than one querter, but chiefly from the desire in foreign powers to gain an improper ascendant in our councils. How could they better gratify this, than by raising a creature of their own to the chief magistracy of the Union? But the convention have guarded against all danger of this sort, with the most provident and judicious attention.

Alexander Hamilton, The Federalist No. 68.

The Constitutional Convention also rejected the notion that the future presidents only had to be a "citizen" or just a "born citizen."   While the Convention's Committee on Detail originally proposed that the President must be merely a "citizen of the United States," as well as

a resident for 21 years,[4] the Committee of Eleven only grandfathered the status of a "Citizen" of the United States and required future presidents to be a "natural born citizen." Madison, p. 596. At the end of the Constitutional Convention, Hamilton gave to Madison a draft of the Constitution that he had prepared.  The Hamilton Plan of 1787 read:  "No person shall be eligible to the office of President of the United States unless he be now a citizen of one of the States, or hereafter be born a citizen of the United States." Elliott's Debates:  Volume 5 Appendix to the Debates of the Federal Convention, Note 5, Article IX Sec. 1 in Appendix F.  The Convention delegates were probably aware of this plan but they chose "natural born citizen" instead.

C.      Historical Evidence

1.      Natural Born Subjects In Great Britain

There were no English statutes that acted upon children born in the king's dominion to alien parents.  Hence, the English courts had to step in to decide the question of whether such children were born as natural born subjects.  In Calvin's Case, 7 Coke, 1, 4b-6a, 18a, 18b (1608), the court naturalized at birth Calvin who was born in Scotland to alien parents. The court did so through the jus soli doctrine.  That rule became part of the English common law which carried over into the colonies and eventually to the states after the American Revolution.   So, the English common law naturalized children born in the king's dominions and under his obedience to alien parents to be natural born subjects for all intents and purposes.  One of the most prolific legal writers of the eighteenth century, Timothy Cunningham, understood this:  "Naturalization is an adoption of one to be intitled by birth to what an Englishman may claim; and where naturalization is, it takes effect from the birth of the party."  1 Timothy Cunningham, A New and

---

[4] Madison, p. 509.

7

Complete Law-Dictionary, or, General Abridgment of the Law (1783).  Vattel in Section 214 states:  "Finally, there are states, as, England, where the single circumstance of being born in the country naturalises the children of a foreigner."  Hence, Vattel considered children born in the country to alien parents to be aliens and in need of naturalization.  Understanding English common law and its jus soli rule, he concluded that the English common law operating in England naturalized those children to be English subjects. But as we shall see, the Framers did not adopt this English common law rule of naturalization.  Rather, they required that children born in the country had to be born to citizen parents for they themselves to be citizens.

Jefferson methodically obliterated "subjects" from the third draft of the Declaration of Independence and replaced it with "citizens."[5]  James Madison, writing under the pseudonym Publius in the Federalist Papers, said that using the English common law was "a dishonorable and illegitimate guide" for determining the meaning of the Constitution.  James Madison in Federalist No. 42.  In contrast, he did approve of using the law of nations.  During the Virginia constitutional ratifying convention, Madison in a speech that he gave on June 20, 1788 repeated the same.  Also, Madison wrote to George Washington on October 18, 1787 about the English common law as said that it had no application to the Constitution.  2 Documentary History of the Constitution, IV, 334-336. 3 Records of the Federal Convention of 1787, p. 129 (M. Farrand ed. 1911).[6]

> **2.**     **The Framers Looked To The Law Of Nations And Emer De Vattel And Not The English Common Law For Their Definition Of A "Natural Born Citizen."**

---

[5]   https://www.staugustine.com/article/20100704/NEWS/307049949.

[6]   http://www.constitution.org/jm/17871018_wash.htm.

8

The Framers used the term "natural born citizen," not the English common law term "natural-born subject."  Contemporaneous and subsequent sources outside the Constitution show that "natural born citizen" was a term of art, an idiom in the political discourse of the founding generation and had only one specific meaning which was known and accepted by ordinary citizens in the founding generation.  The historical evidence, as confirmed by case law, shows that they defined a "natural born citizen" under natural law and law of nations as presented by Emer de Vattel and his The Law of Nations, Sec. 212  (London 1797) (1st ed. Neuchatel 1758), where he said that the "natural-born citizens,[7] are those born in the country,[8] of parents[9] who are

---

[7]  The pre-1797 editions used the words "natives, or indigenes." The 1797 edition, translated into English by an anonymous translator, replaced those words with "natives, or natural-born citizens." That this learned person translated such an influential textbook, included in that edition an Article II "natural-born citizen," and ascribed the clause to Vattel is significant evidence that the public meaning of the clause came from Vattel.  Further confirmation of this understanding comes in Dred Scott, 60 U.S. at 476, Minor v. Happersett, 88 U.S. 162, 167 (1875), and U.S. v. Wong Kim Ark, 169 U.S. 649, 680 (1898), which defined a natural born citizen using the definition of the clause found in the 1797 edition.  This is strong evidence that after the Constitution was adopted in 1787 and down to when Wong Kim Ark was decided in 1898, the definition and public meaning of an Article II "natural born citizen" was thought to come from Vattel.

[8]  Vattel defined "country" as "the state, or even more particularly the town or place, where our parents had their fixed residence at the moment of our birth."  Id. at Sec. 122.

[9]  Given that revolutionary America adopted the common law doctrine of coverture (Linda K. Kerber, No Constitutional Rights to be Ladies 15 (New York: Hill & Wang, 1998)), the Framers would have considered a husband and wife as one and therefore "parents" could only mean husband and wife.  Since the wife's allegiance and citizenship become one with the husband, a citizen husband would produce a citizen wife, and conversely, an alien husband would produce an alien wife.  So, a child born in the U.S. to a married U.S. citizen father would be born to citizen parents, since the wife, regardless of her condition, would take on the citizenship of her husband at time of marriage.  So, there were no U.S. citizen husbands and wives with different citizenships and allegiances between them. They would always be both U.S. citizens.  Lynch, Minor, and Wong Kim Ark provided for scenarios wherein parents were both either citizens or aliens.  It was only with the Cable Act of 1922 (ch. 411, 42 Stat. 1021, "Married Women's Independent Nationality Act") that wives were able to take on their own citizenship.

9

citizens" and added that "in order to be of the country, it is necessary that a person be born of a father[10] who is a citizen, for if he is born there of a foreigner,[11] it will be only the place of this birth, and not his country."  Benjamin Franklin in his December 9, 1775 letter to Charles Dumas, an ardent supporter of the American cause residing in The Hague, stated that the Second Continental Congress was frequently consulting the law of nations and Vattel which was needed for constituting the new nation.[12]  Furthermore, other historical evidence and Minor v. Happersett, among other U.S. Supreme Court and lower court cases,[13] confirm that Vattel's

---

But that Act did change the meaning of Article II.

[10]  The Framers would have understood the reference to "father" to mean the citizenship of both the father and mother, for the wife acquired the citizenship of the husband. 1 William Blackstone, Commentaries 442. See also Dred Scott v. Sandford, 60 U.S. 393, 476-77 (1857) (Daniel, J., concurring) (took out of Vattel's definition the reference to "fathers" and "father" and replaced it with "parents" and "person," respectively).

[11]  Jay would have considered anyone owing allegiance to a foreign state or sovereign a foreigner.  Black's Law Dictionary 776 (4th ed. 1968) (defining "foreigner").

[12]  https://founders.archives.gov/documents/Franklin/01-22-02-0172.

[13]  This time-honored definition of a natural born citizen has been confirmed by subsequent United States Supreme Court and lower court cases such as The Venus, 12 U.S. (8 Cranch) 253, 289 (1814) (Marshall, C.J., concurring and dissenting for other reasons, cites Vattel and provides his definition of "natives, or indigenes," or who the Framers called natural born citizens); Inglis v. Trustees of Sailors' Snug Harbor (1830) (decided on the citizenship principles of the law of nations and Vattel and not the English common law); Shanks v. Dupont, 28 U.S. 242, 245 (1830) (decided on the citizenship principles of the law of nations and Vattel and not the English common law); Dred Scott v. Sandford, 60 U.S. 393 (1857) (relied upon the law of nations definition of citizenship and not the English common law definition of a natural born subject) (Daniel, J., concurring) (specifically citing and quoting Vattel and his Section 212 for the definition of "natives, or natural-born citizens" and not the English common law); The Slaughter-House Cases, 83 U.S. 36 (1873) (in explaining the meaning of the Fourteenth Amendment clause, "subject to the jurisdiction thereof," said that the clause "was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States"); Minor v. Happersett, 88 U.S. 162, 167-68 (1875) (same definition without citing Vattel); Ex parte Reynolds, 1879, 5 Dill., 394, 402 (same definition and

10

definition became American common law and was incorporated into Article III "Laws of the

United States."  Rep. John Bingham (in the House on March 9, 1866, in commenting on the Civil

Rights Act of 1866 which was the precursor to the Fourteenth Amendment: "I find no fault with

the introductory clause, which is simply declaratory of what is written in the Constitution, that

every human being born within the jurisdiction of the United States of parents not owing

allegiance to any foreign sovereignty is, in the language of your Constitution itself, a natural born

citizen." John A. Bingham, (R-Ohio) US Congressman, March 9, 1866 Cong. Globe, 39th, 1st

Sess., 1291 (1866)).[14]

This natural law/law of nations definition was also confirmed by David Ramsay (1789),

St. George Tucker (1803), James Wilson (1792), Nathan Dane (1824), and the early Congresses

---

cites Vattel); United States v. Ward, 42 F.320 (C.C.S.D.Cal. 1890) (same definition and cites
Vattel); United States v. Wong Kim Ark, 169 U.S. 649 (1898) (quoted the same definition of
natural born citizen as did Minor).

[14]  John Jay considered the law of nations part of the "laws of the United States."  Patrick
J. Charles, Decoding the Fourteenth Amendment's Citizenship Clause:  Unlawful Immigration,
Allegiance, Personal Subjection, and the Law, 51 Washburn L.J., Issue 2 (forthcoming Spring
2012) (citing The City Gazette and Daily Advertiser (Charleston, S.C.), August 14, 1793, at 2,
col. 1).  See Andrew C. Lenner, The Federal Principle in American Politics, 1790-1833 (2001)
(Shows that the Federalist considered the Constitution has being grounded on natural law and the
law of nations and that it could be understood only in light of principles under those laws.
Explains how the Federalist incorporated the law of nations into American common law and
considered that law as part of the laws of the United States.  Lenner thoroughly examines how the
Federalist looked to the law of nations and Vattel to resolve many national problems with
which they were faced in the republic's early years). The English common law continued to have
limited application in the states, but not on the national level where it gave way to the supremacy
of the national authority.  See also Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1966) (J.
Souter, dissenting) (the Founders were hostile to receiving English common law as federal law
for "the political systems of the new Republic").  Compare Smith v. Alabama, 124 U.S. 465, 478
(1888) (there is no "national customary law" apart from the English common law which the
states selectively adopted as local law and did not abrogate by statute; only use the English
common law to assist in interpreting the Constitution if its "language" is implicated).

11

in 1790, 1795, and 1803.[15]  The historical evidence that bears upon the question of how the

Framers defined a natural born citizen demonstrates that there is no evidence that the Framers

had an expansive definition of an Article II natural born citizen.  It shows that they limited their

definition to a child born in the country to two parents who were its citizens. It does not show

that they included as natural born citizens children born in the U.S. to alien parents.  In short, the

dichotomy between a "citizen" of the U.S. and a "natural born citizen" of the U.S. and the

American common law definition of a natural born citizen come from the law of nations. It They

did not come from the English common law.

### 3.    David Ramsay

Founder historian, David Ramsay, in his, A Dissertation on the Manners of Acquiring the

Character and Privileges of a Citizen (1789), provides direct and convincing evidence from the

Founding period that the Framers required citizen parents to produce a "natural born citizen"[16]

---

[15]  Some other sources, among others, are John Locke (1689) (a minor child follows the parents' condition); Samuel von Pufendorf (in 1691 he said the *Indigenae,* or Natives" are born to "Citizens"); Jaques Burlamaqui (in 1747 said citizenship belongs in the founders of a society and to the children of citizens); Thomas Jefferson (his 1779 citizenship laws were jus sanguinis based); Alexander Hamilton (in Rutgers v. Waddington (1784) relied heavily upon the law of nations and Vattel); and James Madison (wrote to George Washington on October 18, 1787 that the convention did not adopt the English common law); House Speaker Langdon Cheves (1814) (gives Vattel's citizenship definition); and Pastor Alexander McLeod (1815) (same). See also V. Charles Adams (in his letter of February 17, 1794 to his father, John Adams, quoted and cited Vattel for the proposition that treaties should in general be respected among nations; rejected William Blackstone's doctrine of indelible allegiance and adopted the rule of expatriation that Vattel put forth in The Law of Nations at Sections 220-226. (https://founders.archives.gov/documents/Adams/04-10-02-0007-0006).

[16]  The law of nations definition of a "natural born citizen" is a combination of natural law (citizenship inherited from parents) and positive law (citizenship acquired from place of birth) or otherwise stated as the unification of jus sanguinis and jus soli at birth which produces unity citizenship and natural allegiance from the moment of birth.  Vattel, Sections 212-17.

12

and that they did not simply take the English common law "natural born subject" and substitute in its place a "natural born citizen."  He said that after July 4, 1776, birthright citizenship as a "natural right" was preserved only for a child born to citizen parents, that such "[c]itizenship is the inheritance of the children of those who have taken part in the late revolution; but this is confined exclusively to the children of those who were themselves citizens…." Id. at 6.   He explained that there is an "immense" difference between a British "subject" and a United States "citizen."  He added that "citizenship by inheritance belongs to none but the children of those Americans, who, having survived the declaration of independence, acquired that adventitious character in their own right, and transmitted it to their offspring…." Id. at 7. Ramsay did not look to English common law but rather to natural law. As we can see, Ramsay required the future "natural born citizens" to be children of citizens.

### 4.   St. George Tucker

St. George Tucker, a highly influential founding generation lawyer and jurist, known as America's Blackstone, wrote Blackstone's Commentaries: with Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of The Commonwealth of Virginia (1803) ["Commentaries"].  Tucker's purpose in writing his Commentaries was to show that American common law was different from English common law.  Tucker's definition of a "natural born citizen" coincides with the law of nation's definition and not with that of the English common law.

On expatriation, Tucker criticized Blackstone for maintaining that "universal law" dictated that such a right did not exist.  Tucker, in analyzing what that alleged "universal law" was, said that it would have been the "law of nature and nations."  In explaining what that "law

13

of nature and nations" was, he looked to "divine law," the "law of nature," and the "law of nations" themselves.  He then showed that these sources did not support what Blackstone said. We know that expatriation is tied to citizenship.  It is therefore reasonable to conclude that the Framers would also have looked to this "universal law" as Tucker did and not Blackstone's English common law when they sought to define a "natural born citizen."

Tucker also specifically addressed what a "natural born citizen" was by informing who had the "civil right" to be elected President.  He explained that the right to be elected President was one of the most important "civil rights," "civil rights" were only possessed by citizens who either inherited or acquired rights, and while naturalized citizens acquired "civil rights," only a person born to citizen parents inherited them.  He said that naturalized citizens were forever barred from possessing the right to be elected President.  Hence, the "civil right" to be elected President could only be inherited and not acquired.  Since only a child born to citizen parents inherited civil rights and the right to be elected President could only be inherited, the civil right to be elected President belonged only to a child who was born to citizen parents.  So only a person born to citizen parents became a citizen not by naturalization.  And only a person born to citizen parents was a "natural born citizen" and therefore eligible to be President.  From Tucker's explanation as to who possessed the "civil right" to be elected President, we arrive at the inescapable conclusion that a "natural born citizen" could only be a child born to citizen parents.

**5.    James Wilson**

Founder and Supreme Court Justice James Wilson said that "a citizen of Pennsylvania is he, who has resided in the state two years; and, within that time, has paid a state or county tax: or he is between the ages of twenty one and twenty two years, and the son of a citizen." James

14

Wilson, 1st commentaries on the Constitution (1792). Here we have Wilson referring to what could only be a "natural born Citizen" as "the son of a citizen."

### 6.    Nathan Dane

Nathan Dane, the Father of American jurisprudence, like Tucker, wrote on American law and demonstrated how it differed from English statutory and common law. Dane, after explaining how the English common law and Calvin's case defined who was a subject and who was an alien, demonstrated that the United States did not adopt the jus soli rule, but rather the jus sanguinis (right of blood) rule.  Under both English and American common law, an alien could not inherit lands or estates. Dane concluded that a child born in the United States to alien parents (an English father who married a U.S. citizen mother) was an alien ("because this child follows the allegiance of its father" and is thus English) and therefore could inherit in England, but not in the United States. Given his role in the Founding, in the adoption of the Constitution, and his highly acclaimed treatises on American law, Dane was in a position to know how the Framers defined the new national citizenship of the United States, including how they defined a natural born citizen. *See* 4 Nathan Dane, A General Abridgment And Digest Of American Law, Ch. 131, art. 2, § 2-8, 698 (1824) ("Abridgment").

### 7.    The Naturalization Acts Of Congress

The early naturalization acts passed by legislators many of whom were Founders and Framers, are solid evidence that the Framers defined a "natural born Citizen" as a child born in the United States to citizen parents.  These acts[17] did not provide that any person by mere birth in

---

[17]  The Naturalization Acts of 1790 (1 Stat. 103), 1795 (1 Stat. 414), 1802 (2 Stat. 153), and 1855 (10 Stat. 604).

15

the United States was a "citizen" of the United States.  There exists an article published by

"Publius" (probably James Madison), on October 7, 1811, in The Alexandria Herald, concerning

the 1802 Act and the "Case of James McClure," which shows that at that time a child born in the

United States to alien parents was considered under the 1802 Naturalization Act and alien.[18]

When commenting on the 1790 and 1795 Naturalization Act, Dane treated children born in the

U.S. to alien parents as aliens.  Abridgement, § 2, 698.  With Congress exercising its

naturalization powers and passing that Act, all children born in the United States to alien parents

were made aliens, for they could not rely on the English common law for their citizenship.

Hence, these Congressional Acts abrogated any English common law rule that may have

prevailed in the colonies before the revolution and the Constitution was adopted. Additionally,

Congress only gave to children born out of the U.S. to U.S. citizen parents through naturalization

the rights and privileges of a natural born citizen.  It did not nor could it through naturalization

make those children actual natural born citizens.  Hence, with respect to children born in the

U.S., it was the citizenship of a child's parents which determined whether the child was a citizen

or not. Even if the child was born in the United States, if his or her parents were not U.S.

citizens, the child was nevertheless not recognized to be born a citizen and had to naturalize

derivatively or on his or her own.

   The early naturalization acts tell us what a "natural born citizen" is by a process of

elimination.  The only child that was not impacted by any Act of Congress which bestowed

citizenship on a child was a child born in the country to citizen parents. This was a  "natural born

Citizen" who did not need any Congressional Act for his or her birthright citizenship and who

---

[18]  https://naturalborncitizen.files.wordpress.com/2011/12/alexandria-herald.pdf.

16

was defined under the law of nations and American "common-law." Hence, according to the early Congresses as is expressed by it through the Naturalization Acts of 1790, 1795, 1802, and 1855, only a child born in the United States to citizen parents could be a "natural born Citizen." All other children, no matter where born, if they could be U.S. citizens under any Act of Congress, could only be under Congress's naturalization powers a naturalized citizen, either "at birth" or after birth.

## II.     Developments Surrounding the Fourteenth Amendment Did Not Change the Meaning of Natural Born Citizen.

### A.     Civil Rights Act Of 1866

Dred Scott v. Sandford, 60 U.S. 393 (1857) had held that because slaves were property and therefore never citizens, children born to freed slaves, and those born to non-U.S. citizen parents, were also not citizens of the United States. The Civil Rights Act of 1866 empowered freed slaves to be U.S. citizens. Having lost all vestiges of allegiance to any foreign power, slaves were not born "subject to a foreign power." Hence, they could qualify for U.S. citizenship under the Act. Even though those persons would have been born in the U.S., the Act did not state that those persons were natural born citizens. Rather, the Act only made citizen of those persons; it did not make them natural born citizens. The Act did not naturalize children born in the U.S. to alien parents because unlike slaves and free blacks, those born to non-U.S. citizen parents were born "subject to a foreign power," *i.e.*, those children inherited through jus sanguinis the citizenship of their alien parents. Hence, they did not qualify for U.S. citizenship under the Act. Through the Fourteenth Amendment, Congress only required that, to be citizens, persons be born in the U.S. while "subject to the jurisdiction thereof."

17

**B.      The Fourteenth Amendment**

To naturalize those children, Congress used the Fourteenth Amendment and its "subject to the jurisdiction thereof" clause.  The amendment was needed because under <u>Dred Scott</u>, slaves and their descendants, whether free or not, were not considered as being members of that community even though born on U.S. soil and unlike the American Indians subject to the jurisdiction thereof.  But the amendment only allowed these slaves and their descendants to become a member of the U.S. community by making them U.S. citizens, *i.e.*, those born on U.S. soil or naturalized and subject to the jurisdiction thereof are U.S. citizens.

The intent and purpose of the amendment was to provide equal citizenship to all Americans either born on U.S. soil or naturalized therein and subject to the jurisdiction thereof. It does not grant "natural born citizen" status.  It only confers "citizen" status, as that is the exact word used by the Amendment itself and that is the same word that appears in Article I, II, III, and IV of the Constitution.  It just conveys the status of "citizen," and as we learned from how the Framers handled the Naturalization Acts of 1790 and 1795, being a "citizen" does not make one a "natural born citizen."  The framers of the Fourteenth Amendment gave citizenship from the moment of birth to all persons born in the U.S. and subject to its jurisdiction (not limited to those born to U.S. citizen parents), but the best that they could offer them was the status of a "citizen" and not that of a "natural born citizen."  Hence, what followed was the framers' treating in the Amendment those born in the U.S. while subject to its jurisdiction and those naturalized in the U.S. the same by calling them both "citizens" of the United States.

Also, there is no evidence from the Congressional debates on the Amendment that the framers intended to amend the meaning of an Article II natural born citizen. We know that when

18

Congress used the word "citizen," it did not mean to write "natural born citizen" because if it did, then naturalized persons would become natural born citizens.  This result cannot be, given that there has never been any doubt in the U.S. that naturalized persons are not nor can they be natural born citizens. There is no indication in the debate over the citizenship element of the Fourteenth Amendment that the framers were stating the definition of a natural born citizen in the amendment.  The whole debate was about who was going to be included as a "citizen" of the United States, not who was going to be accepted as a "natural born citizen" of the United States. There is no evidence that the framers meant to treat those new "citizens" of the United States as "natural born citizens" of the United States. Even though Lynch had proclaimed that a person born in the U.S. to alien transient parents was a natural born citizen  and therefore eligible to be President, not one person in either the House or Senate supported that view or even said that a person who becomes a citizen of the United States under the Fourteenth Amendment is a natural born citizen and therefore eligible to be President.

The Fourteenth Amendment established "a floor on citizenship." Robinson v. Bowen, 567 F. Supp. 2d 1144, 1145 (N.D.Cal.2008).  The Amendment did not repeal or amend Article II's natural born citizen clause.  The Fourteenth Amendment did not change the American common law definition of a "natural born citizen."  It did not give "citizens" any new rights.[19] The amendment did not include "citizens" who are not "natural born citizens" into the latter class.  The Fourteenth Amendment was passed only to give basic citizenship to the former slave class and to make "citizens" equal which did not include making them equal to "natural born

---

[19] Minor, 88 U.S. at 171 ("The amendment did not add to the privileges and immunities of a citizen").

19

citizens" who are the only ones who are eligible to be President and Vice-President.

The framers of the Fourteenth Amendment inserted into the Amendment the words "citizen" of the United States.  They did not use "natural born citizen" of the United States. Congress would have known the critical distinction between the two classes of citizens.  The Constitution itself makes the distinction in Article II:  "No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President." We can see how the Framers carefully distinguished between the two classes of citizens. With this dichotomy, we must conclude that the two classes of citizenship had their own distinct and separate definitions.

Our Supreme Court has recognized the difference between these two clauses and especially as they relate to eligibility to be President of the United States.  "The President must not only be a citizen but 'a natural born Citizen.'" Sugarman v. Dougall, 413 U.S. 634, 651 (1973) (Rehnquist, J., dissenting).  Additionally, the First and Third Congress was also careful to distinguish between the two classes of citizens.  With this drafting history, the Congress that drafted the Fourteenth Amendment would have known of the distinction that the original framers made between a natural born citizen and a citizen of the United States.  With that knowledge, they chose "citizen" of the United States rather than "natural born citizen" of the United States.[20]

The framers of the Fourteenth Amendment also said "all" those who are born in the U.S. and subject to its jurisdiction are "citizens" of the United States.  Given that they placed those

---

[20]  Congress later confirmed that the Fourteenth Amendment only referred to a citizen and not a natural born citizen when it added the following to 8 U.S.C. § 1401(a):  "The following shall be nationals and citizens of the United States at birth: (a) a person born in the United States, and subject to the jurisdiction thereof."

20

born in the U.S. with those naturalized in the U.S. in the same sentence, they did not say and could not say that those citizens were "natural born citizen."  First, they included naturalized citizens in the entire group that they were declaring to be "citizen" of the United States which clearly tells us that "citizens" of the United States could not mean "natural born citizens."

Second, if the framers had meant and wanted to say that all persons born in the U.S. and subject to its jurisdiction were natural born citizens, they could have simply kept persons born in the U.S. and subject to its jurisdiction in a separate class and said that they were natural born citizens and then followed in a separate part of the sentence or whole sentence that naturalized citizens were "citizens" of the United States. But they did not do that.  They joined those born in the U.S. while subject to its jurisdiction and those naturalized in the U.S. in one sentence and treated them equally by saying that they were both just "citizens," not "natural born citizens." Hence, there can be little doubt that the framers did not intend to define a natural born citizen in the Fourteenth Amendment, but rather only a "citizen" of the United States.

To maintain that the Fourteenth Amendment, which uses "citizens" of the United States and not "natural born citizens" of the United States, defines a natural born citizen would write the natural born citizen clause right out of the Constitution.  Such an interpretation of the Article II and the Fourteenth Amendment would give no effect to Article II's natural born citizen clause. Chief Justice Marshall explained in <u>Marbury</u> that such an interpretation of the Constitution is inadmissible.  No U.S. Supreme Court case has held that the Fourteenth Amendment defines an Article II natural born citizen, including <u>Wong Kim Ark</u>.  Both <u>Minor</u> and <u>Wong Kim Ark</u> determined that the Amendment does not define a natural born citizen. Hence, showing that one is a Fourteenth Amendment "citizen" is not sufficient to demonstrate that one is an Article II

21

"natural born citizen."

Despite Congress having abandoned the language of the Civil Rights Act and replacing it with "subject to the jurisdiction," the Supreme Court in The Slaughterhouse Cases still applied the law of nations and American common law standard to U.S. citizenship of the Fourteenth Amendment. Slaughter-House Cases, 83 U.S. 36, 73 (1872). ("The phrase, 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States.") In Minor, a unanimous U.S. Supreme Court defined the Article II "natural-born citizen" class as part of its analysis of whether Virginia Minor was a "citizen." The Court held that under "common-law" with which the Framers would have been familiar,

> it was never doubted that all children born in a country of parents who were its **citizens** became themselves, upon their birth, citizens also. These were **natives or natural-born citizens**, as distinguished from aliens or foreigners. Some authorities go further and include as **citizens** children born within the jurisdiction without reference to the citizenship of their parents. As to this class there have been doubts, but never as to the first.

Minor v. Happerset, 88 U.S. 162, 67-68 (emphasis supplied).[21] Minor explained that all members of the U.S. were called "citizens." It added that the children born in a county to "citizen" parents were the "natural-born citizens." Here we see the difference between a "citizen" and a "natural-born citizen," with the latter coming into being only by birth in a country to "citizen" parents. Minor did not cite Vattel, but the Court's definition of a "citizen" and a "natural born citizen" is paraphrased directly from Section 212 of his treatise. It was not taken

---

[21] The Court's definition of "natives, or natural-born citizens" is a paraphrase of the definition of those terms found in, Emer de Vattel, The Law of Nations, or Principles of the Laws of Nature, Applied to the Conduct and Affairs of Nations and Sovereigns, bk. 1, c. 19, sec. 212 Citizens and natives (London 1797) (1st ed. Neuchatel 1758).

22

from the English common law.[22]

When Minor said that "there have been doubts" regarding whether a child "born in the jurisdiction" to alien parents was a "citizen," the Court was not questioning whether that child was a "natural born citizen."  Rather, it was referring to whether that child was a "citizen" under the Fourteenth Amendment.  The Court explained that even with the passage of the Fourteenth Amendment, the question of whether children born in the U.S. to alien parents were U.S. "citizens" remained. Hence, the Court did not disagree with The Slaughterhouse Cases statement.  But the Court did not have to resolve the question of whether the statement was correct, because Virginia Minor was born in the U.S. to U.S. citizen parents.  The Court explained that there was never any doubt that children born in the U.S. to U.S. citizen parents were "citizens," themselves like their parents.  It explained that these were the "natural born citizens." Because there was no doubt that Virginia Minor was a citizen, that was sufficient for the Court to move to the next part of its decision which dealt with the question of whether being a citizen of the U.S., the State of Missouri could not deny her the right to vote.

The Fourteenth Amendment was part of the Constitution when the Court decided Minor. So, when Minor said that the definition of a "natural born citizen" was in the "common-law" and not in the Constitution, it also meant that it was not found in the Fourteenth Amendment.  Given the Court's definition, which included citizen parents, clearly the Court did not rely upon any

---

[22]  By this definition of a natural born citizen, Minor in effect overruled Lynch v. Clark, 1 Sandf. Ch. 656  (N.Y. 1844), which relied on the English common law to define a citizen of the United States.  The New York Legislature also rejected the Lynch decision when it passed the New York Code on citizenship of New York which provided: "Sec. 5. The citizens of the state are:
1. All persons born in this state and domiciled within it, except the children of transient aliens and of alien public ministers and consuls." Political Code of the State of New York (1860).

23

English common law which did not include such a requirement.  Rather, the Court relied upon American "common-law" which had its origins in natural law and the law of nations, as commented upon by Vattel in Section 212.

The New Jersey Supreme Court in Benny v. O'Brien (1895), 29 Vroom (58 N.J.Law) recognized the problem that the Civil Rights Act of 1866 and the Fourteenth Amendment made free blacks citizens of the United States, but denied the same for children born in the United States to white alien European parents, but still found that such children were citizens of the United States under the premise that if that were not the case the Fourteenth Amendment did not make free blacks citizens either.  As we can see, those children, like the children of freed slaves, needed naturalization and the Fourteenth Amendment provided a way for them to become citizens of the U.S. from the moment of birth, although naturalized at birth.

The U.S. Supreme Court in Wong Kim Ark basically took up the same question that the New Jersey Supreme Court decided in Benny.  Wong Kim Ark held, by resorting to the colonial English common law to inform on the meaning of "subject to the jurisdiction," that a "a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States." Id. at 705. It did not overrule Minor's American common law definition of a natural born citizen.  On the contrary, it approvingly cited and quoted Minor's definition of a natural born citizen and its resort to the American common law to define it.  Wong's holding did not mention "natural born citizen," let alone define it.  It did not change the common law definition of a "natural born

24

citizen" provided by <u>Minor</u>.  It only decided the Fourteenth Amendment question left open by

<u>Minor</u>.[23]

      This case law demonstrates that there is no evidence supporting an expansive definition

of an Article II natural born citizen.  It does not support including as natural born citizens

children born in the U.S. to alien parents.  This case law shows that there had been doubts

whether children born in the U.S. to alien parents were U.S. citizens, but that those doubts were

resolved by the Fourteenth Amendment and the decision of <u>Wong Kim Ark</u>. The Court's

expansion of U.S. citizenship to include children born in the U.S. to alien parents did not affect

the original and only meaning of a natural born citizen which from the beginning of the republic

never changed.

## III.    Kamala Devi Harris Is Not a Natural Born Citizen

      Under Article II, to be a candidate for Vice President, Kamala Harris must be natural born

citizen, not just citizen of the United States.  The constitutional distinction between the two types

of citizenship is that a natural born citizen has unity of citizenship and natural allegiance.  Jay,

who wanted a "strong check" on keeping foreign influence out of the office of commander-in-

chief, would not have allowed a person born to alien parents to be eligible for the office of

Commander-in-Chief of the Military and President.  The President and Commander and the

Vice-President need to have since the time of birth unity of citizenship and natural allegiance to

the U.S.

---

[23]  Defendant cites <u>Tisdale v. Obama</u>, 2012 WL 7856823, at *1 (E.D.Va. Jan.23, 2012) and <u>Ankeny v. Governor of State of Ind.</u>, 916 N.E.2d 678 (Ind.Ct.App.2009).  We have shown that these cases were not correctly decided.  Defendant also cites <u>Plyler v. Doe</u>, 457 U.S. 202 (1982) and <u>INS v. Rios-Pineda</u>, 471 U.S. 444 (1985).  Both cases only addressed who are "citizens" under the Fourteenth Amendment.

25

Kamala Harris was born in California in 1964 to a father who was a citizen of Jamaica and a mother who was a citizen of India.  They were in the U.S. on a temporary basis and on student visas to study at American universities. Harris' birth to non-U.S. citizen parents caused her not to be born with unity of citizenship and natural allegiance to the U.S. Her non-U.S. citizen parents caused her to be born with allegiance not only to the U.S., but also to Jamaica and India.  Harris has been since 1964 a "citizen" of the United States from the moment of birth by virtue of the Fourteenth Amendment. But not satisfying the constitutional American common law definition of a natural born citizen, *i.e.*, a child born in the country to citizen parents, she is not nor can she be a "natural born citizen."  Being neither a "natural born Citizen," [n]or a Citizen of the United States, at the time of the Adoption of this Constitution" she is not eligible to be either Vice President and (or President) of the United States.

**CONCLUSION**

Should the Court also reach the merits of the natural born citizen issue, it should conclude that Kamala Harris is not a natural born citizen.

Respectfully submitted,

| | |
|---|---|
| _____/s  William J. Olson_____ | Mario Apuzzo* (NJ Bar No. 030611982) |
| William J. Olson (D.C. Bar No. 233833) | 185 Gatzmer Avenue |
| Jeremiah L. Morgan (D.C. Bar No. 1012943) | Jamesburg, New Jersey 08831 |
| William J. Olson, P.C. | (732) 521-1900 |
| 370 Maple Avenue West, Suite 4 | apuzzo@erols.com |
| Vienna, Virginia  22180-5615 | *pro hac vice motion forthcoming |
| (703) 356-5070 | |
| wjo@mindspring.com | |

Dated:  November 9, 2020                     Counsel for *Amicus Curiae*
                                             U.S. Allegiance Institute